**USAIR, INC., Plaintiff,**

v.

**NATIONAL MEDIATION BOARD, Defendant,**

**International Brotherhood of Teamsters, Airline Division, Intervenor–Defendant.**

**No. CA 88–1604–A.**

United States District Court, E.D. Virginia, Alexandria Division.

April 18, 1989.

Richard C. Hotvedt, Roy A. Sheetz, Morgan, Lewis & Bockius, Washington, D.C., Betty Leach, USAir, Inc., Arlington, Va., Thomas Rawles Jones, Cohen Dunn & Sinclair, Alexandria, Va., for USAir.

Henry E. Hudson, U.S. Atty., Paula Potoczak, Asst. U.S. Atty., Alexandria, Va.

Ronald M. Etters, National Mediation Bd.

Patrick J. Riley, Inter. Bro. Teamsters, Washington, D.C., for intervenor-defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

### INTRODUCTION

This case presents a challenge to the certification of a union to represent a craft or class of airline employees. At issue is the extent to which certain National Mediation Board ("NMB") certification actions are subject to judicial review under the Railway Labor Act, 45 U.S.C. §§ 151 *et seq.* ("RLA"). More specifically, a representation dispute arose following an airline merger. The NMB's services were invoked to resolve the dispute. An election was held. The Teamsters won a plurality and were certified by the NMB. Plaintiff, USAir, Inc. ("USAir"), attacks this certification, arguing that the NMB exceeded or

violated its statutory duty under the RLA in the following respects:

(1) the exclusion of the ballots of 197 fleet service employees.

(2) the failure to investigate alleged election improprieties.

(3) the certification of a union that received a plurality, but not a majority, of the votes cast.

In response, the NMB, supported by the Teamsters,[1] argues that the NMB acted within its discretion under the RLA, that judicial review of this discretion is sharply limited to scrutiny for "gross violations of law," and that USAir has shown no such violations.

The matter is before the Court on the NMB's motion to dismiss or, in the alternative, for summary judgment and the Teamsters' motion to dismiss. The material, dispositive facts are not disputed. Summary judgment treatment is therefore appropriate. Rule 56, Fed.R.Civ.P. Accordingly, for the reasons stated here, the Court concludes that summary judgment on the motions should be granted.

Also before the Court is the Teamsters' motion for summary judgment on the union's counterclaim. Through this counterclaim, the Teamsters seek an order compelling USAir, (1) "to treat" with, i.e. bargain with, the union, (2) to disclose to the union the names, addresses, telephone numbers and wage and seniority data for all of USAir fleet service employees and (3) to permit the Teamsters access to the various USAir workplaces. The counterclaim, like the complaint involves no genuinely disputed issues of material fact. It is, therefore, amenable to summary disposition. For the reasons stated, the Teamsters' mo-

tion for summary judgment on the counterclaim is denied.

## FACTS

Pacific Southwest Airlines ("PSA") merged into USAir on April 9, 1988. Prior to the merger, the Teamsters had represented a craft or class of nearly 2,000 fleet service agents at four USAir locations. The Teamsters had also represented a combined craft or class of approximately 1,500 fleet and passenger service employees of PSA. "Fleet service" employees perform such functions as fueling, cleaning and provisioning of aircraft, moving freight and baggage and using and positioning ramps, trucks and dollies. "Passenger service" employees generally process and dispatch passengers at gates and ramps and perform a variety of other clerical tasks involving passenger contact. At some facilities, the same group of employees share fleet and passenger service duties.[2]

On August 20, 1987 in anticipation that the merger would spawn a representation dispute, the Teamsters invoked the services of the NMB.[3] Two weeks later, the Teamsters filed an application with the NMB to represent all fleet service employees following the merger. USAir opposed this application as contrary to, or inconsistent with, the NMB's existing craft or class determinations. USAir also requested termination of PSA's existing certifications following the merger on the ground that PSA would cease to exist as a separate entity. The NMB agreed and on April 7, 1988 terminated the Teamsters' PSA certifications. USAir, 15 N.M.B. 135 (1988). The NMB further concluded that there existed questions concerning the appropriate craft or class that could only be resolved through investigation.[4] Such an investiga-

1. The Teamsters' intervention was permitted by the Court pursuant to Rule 24, Fed.R.Civ.P.

2. At USAir's approximately 97 other airport locations, the NMB had recognized a combined passenger and fleet service craft, but that combined group was not represented by any union. See 6 N.M.B. 542 (1978); 6 N.M.B. 490 (1978).

3. The NMB has two primary duties under RLA: (1) to mediate disputes between carriers and unions (45 U.S.C. §§ 155, 158), and (2) to inves-

tigate representation disputes and then determine and certify the bargaining representative of crafts or classes of employees (45 U.S.C. § 152 Ninth).

4. In these circumstances, an investigation is a necessary step toward a certification determination under the RLA. To be resolved in the investigation are the threshold questions (1) whether a "carrier" is involved (45 U.S.C. § 151, First); (2) whether "employees" are involved (45 U.S.C. § 151, Fifth); and (3) whether there is a

tion had already commenced as a result of the Teamsters' September 1987 application. The NMB noted the investigation would now continue.

On April 12, 1988, the NMB began its field investigation, which included on-site visits. The NMB mediator conducted on-site investigations of USAir stations in ten cities previously agreed to by USAir and the Teamsters. At each location, the mediator interviewed randomly selected employees. No formal adversary hearing was held, nor was any required by the RLA or the NMB's procedures.[5] But as part of its investigation, the NMB did consider numerous written position statements submitted by USAir and the Teamsters setting forth their views as to the appropriate craft and class. USAir argued that a combined passenger service/fleet service craft or class was warranted given the frequent shifting and sharing of passenger service and fleet service functions. Ultimately, this view did not prevail. On September 29, 1988, the NMB ruled that a distinct craft and class of fleet service employees existed throughout the USAir system. The NMB further concluded that a representational dispute existed among USAir's fleet service employees and authorized a mail ballot election consistent with its established procedures. Also consistent with its established procedures, the NMB established voter eligibility cut-off dates based on the last day of the payroll period prior to the scheduling of the dispute for investigation.[6] Thus, as USAir and PSA were separate carriers prior to April 9, 1988, two cut-off dates were established: April 5, 1988, for former PSA employees and April 8, 1988, for USAir employees. The election itself was scheduled for November and December. Ballots were scheduled to be mailed on November 10, 1988 and counted on December 14, 1988.

On October 18, 1988, USAir filed a motion with the NMB arguing that the cut-off dates excluded approximately 197 employees who were not engaged in fleet service jobs in April, but who transferred to such jobs thereafter. According to USAir, these transfers reflected only normally-expected movement between passenger and fleet service jobs, especially following a merger; it did not represent an effort to pack the craft or class. USAir also pointed out that these employees had requested the transfers before the class was reconfigured. USAir emphasized that the transfers were not the result of anti-union animus. Given this, USAir urged a change in the cut-off dates to accommodate the 197 employees. NMB agreed only to send challenged ballots to these 197 employees and to defer to a later date whether to count them.

On November 4, 1988, prior to the mailing of the ballots, USAir reported to the NMB that Teamsters representatives intended to collect ballots rather than to let the employees mail their ballots as required by the rules. USAir proposed notice language to warn against such improper ballot collection. The Teamsters denied the allegations. After considering USAir's allegations, the NMB found insufficient evidence of a Teamsters plan to collect ballots and thus no reason to send USAir's proposed notice. The union, however, elected to send its own notice warning organizers and stewards not to collect ballots. This

---

dispute among the "craft or class" of the employees involved (45 U.S.C. § 152, Fourth). If the investigation produces affirmative answers to these questions, a Board conducted election is held.

5. NMB's procedures are set forth in its *Representation Manual* ("Manual") which provides general guidance to NMB staff on investigative techniques and other procedures to be used in handling representation disputes. *See British Airways Bd. v. National Mediation Bd.*, 533 F.Supp. 150 (E.D.N.Y.), *aff'd*, 685 F.2d 52 (2d Cir.1982); *Air Canada v. National Mediation Bd.*, 107 L.R.R.M. (BNA) 2028, 2030 (S.D.N.Y.

1980), *aff'd mem.*, 659 F.2d 1057 (2d Cir.), *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 381 (1981).

6. The NMB's Manual includes the following provision relating to cut-off dates for voter eligibility:

The list of potential eligible voters should contain all individuals with employee-employer relationships as of the last day of the last payroll period prior to the initial scheduling of [the] dispute for investigation.... Manual § 3.503–5.

notice was issued the day before the ballots were mailed.[7]

Ballot mailing occurred as scheduled. On December 5, 1988, the NMB informed USAir that the cut-off dates would not be changed and hence the challenged ballots sent to the 197 employees would not be counted. Apart from this, however, standard procedures were followed and all ballot challenges were resolved prior to the vote count.[8] The final vote count on December 14, 1988 was as follows:

| | |
|---|---|
| Eligible Voters | 3733 |
| Votes for Teamsters | 1854 |
| Votes for IAM (machinists union) | 16 |
| Total Votes for Representation | 1870 |
| Total Votes for no Representation | 1863[9] |

As these figures reflect, the Teamsters received 49.665% of the eligible vote and the IAM .428%. Slightly more than forty nine percent (49.879%) percent voted for no representation. Pursuant to standard NMB procedure, all votes for representation were aggregated to determine whether a majority of the employees had voted to be represented. A majority had so voted: The Teamsters had won 49.665% of the vote to which was added the .426% won by the Machinists Union for a total of 50.091% in favor of representation. Next, the NMB, again in accordance with its procedures, determined that the Teamsters had received a majority of the votes cast in favor of representation.[10]

The day after the final vote count, USAir filed an undocumented objection with NMB alleging improper solicitation of ballots by the Teamsters and vote fraud. USAir demanded that the NMB check every signature on the ballot envelopes with corresponding signature exemplars. USAir also requested two additional weeks to supply supporting evidence. The NMB denied these requests, but agreed to recount the ballots.[11] The recount confirmed the original count.

7. The Teamsters letter to its representatives read, in pertinent part, as follows:

> In case there is any misunderstanding each voter must mail his completed ballot to the National Mediation Board on his own. No shop steward or other local official should collect ballots for the purpose of bulk mailing them to the Board.
> It is extremely important that voters return their completed ballots to the Board on their own. Collection of ballots by USAir officials, Teamsters organizers, stewards or any individual is against the law. We do not want to jeopardize this extremely important election whatsoever. Your dedication and hard work in this election campaign must bear fruit rather than frustration.

8. In the course of the election period, duplicate ballot requests were processed pursuant to the procedures set forth in Manual § 12.201–8. Duplicate ballot requests must be signed by the requesting employee and, when received, the mediator must verify that the request comes from an eligible voter. The duplicate ballot is coded in the same manner as the original and the envelope is marked as a duplicate to ensure that only one ballot is counted for each employee. This procedure ensures that, if an original and a duplicate are received, the duplicate is not counted.

9. This figure consists of three categories of ballots. First, it includes ballots not returned. NMB ballots, unlike those used by the NLRB, do not include a space for employees to vote for "no union representative." Instead, employees may indicate their preference for no representation by not returning the ballot or by writing a notation on the ballot indicating the no representation preference. The latter group is the second category included in the figure. The third category consists of a single ballot listing an individual's name in a space other than the correct write-in space. The NMB initially counted this ballot, mistakenly, as a valid ballot. Consistent with the overall RLA scheme, courts lack jurisdiction to review NMB's decision to use this ballot procedure. *See Bhd. of Ry. & S.S. Clerks v. Ass'n for the Benefit of the Non-Contract Employees,* 380 U.S. 650, 668–71, 85 S.Ct. 1192, 1201–1203, 14 L.Ed.2d 133 (1965).

10. Instructions on the face of each ballot explained this procedure to the voters as follows:

> No employee is required to vote. If less than a majority of the employees cast valid ballots, no representative will be certified. Should a majority vote be represented, the representative which receives a majority of the votes cast will be certified.

11. In denying USAir's request, the NMB noted that its Manual procedures had been followed in the election and that USAir had not presented any evidence to support its claims of election misconduct:

> [A]lthough the carrier alleges that the signatures should be verified because of "improper solicitation," the carrier has failed to provide substantive evidence of improper activity on

On December 21, 1988, USAir submitted its Petition for Further Review, asking NMB to review certain alleged improprieties in the election. Chief among these was NMB's refusal to count the votes of 197 fleet service agents who entered upon their fleet service duties after the NMB imposed cut-off dates. According to USAir, this exclusion was particularly important in view of the narrow margin that decided the election. USAir also raised other incidents of alleged electioneering misconduct. Specifically, USAir alleged that Teamsters representatives unlawfully collected completed ballots, that some employees received unsolicited duplicate ballots, that some employees had not received ballots, that votes of ineligible employees were cast and counted and that some employees had been incorrectly ruled ineligible. On December 22, 1988, the NMB stated it had "carefully" considered USAir's allegations and submissions and found no basis to delay certification.[12] The NMB did recount the original ballots, but did not deem it necessary to compare signature exemplars or take the other action USAir demanded. On February 6, 1989, the NMB issued a more detailed opinion. In this detailed, thirteen page opinion letter, the NMB concluded that there was insufficient evidence of electioneering misconduct or ballot forgery. In so concluding, the NMB considered all the issues and arguments raised by USAir.

On December 22, 1988, NMB certified the Teamsters as the representative of the craft and class of fleet service employees of USAir. This suit to overturn the certification followed immediately thereafter.

## ANALYSIS

### A. The Complaint

*Switchmen's Union v. National Mediation Bd.*, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943) (*"Switchmen's"*) is the seminal decision on judicial review of NMB determinations in representation disputes. There, the Court held that lower courts were not to review the merits of NMB discretionary representation determinations. *Id.* at 304, 64 S.Ct. at 98–99. Congress, the Court observed, had entrusted protection of the employees' collective bargaining rights to the NMB, not to the courts. According to Justice Douglas, speaking for the majority, Congressional intent was clear:

> [T]he dispute was to reach its last terminal point when the administrative finding was made. There was to be no dragging out of the controversy into other tribunals of law.

320 U.S. at 304, 64 S.Ct. at 98–99; *see also Bhd. of Ry. & S.S. Clerks v. Ass'n for the Benefit of the Non–Contract Employees,* 380 U.S. 650, 85 S.Ct. 1192, 14 L.Ed.2d 133 (1965) (*"Railway Clerks"*). *Switchmen's* principle has taken firm root in the Fourth Circuit and elsewhere.[13] In *Rose v. Broth-*

---

the part of the [Teamsters]. Therefore, the Board finds no basis to grant the carrier's request.

**12.** The NMB stated its reasons for denial as follows:

> The [NMB] has carefully considered the carrier's request and finds no basis to postpone the Certification of the election results. The arguments discussed by the carrier in its Petitioner either have been raised and considered previously by the [NMB] in its decisions, or involve points which have been well-settled by the United States Supreme Court and several Circuit Courts.
>
> Further, the carrier has failed to substantiate with sufficient evidence the claims of union interference.

**13.** *See e.g., IAM v. Northeast Airlines,* 536 F.2d 975, 977 (1st Cir.), *cert. denied,* 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 328 (1976); *IAM v. Alitalia*

*Airlines,* 600 F.Supp. 268 (S.D.N.Y.1984), *aff'd,* 753 F.2d 3 (2d Cir.1985); *Long Island R.R. Co. v. National Mediation Bd.,* 703 F.2d 680 (2d Cir. 1983); *Air Line Pilots Ass'n v. Texas Int'l Airlines,* 656 F.2d 16, 20 & n. 6, 23, 24 (2d Cir. 1981); *Ruby v. American Airlines, Inc.,* 323 F.2d 248, 253–56 (2d Cir.1963), *cert. denied,* 376 U.S. 913, 84 S.Ct. 658, 11 L.Ed.2d 611 (1964); *IBT v. Texas Int'l Airlines,* 717 F.2d 157 (5th Cir.1983); *Zantop Int'l Airlines v. National Mediation Bd.,* 732 F.2d 517 (6th Cir.1984); *Air Line Employees Ass'n v. Republic Airlines, Inc.,* 798 F.2d 967, 968–69 (7th Cir.), *cert. denied,* 479 U.S. 962, 107 S.Ct. 458, 93 L.Ed.2d 404 (1986) (recognizing Board's "undeniable sole jurisdiction over representation matters"); *Sedalia–Marshall–Boonville Stage Line v. National Mediation Bd.,* 574 F.2d 394 (8th Cir.), *cert. denied,* 439 U.S. 881, 99 S.Ct. 218, 58 L.Ed.2d 193 (1978); *World Airways v. National Mediation Bd.,* 347 F.2d 350 (9th Cir. 1965), *cert. denied,* 383 U.S. 926, 86 S.Ct. 928, 15 L.Ed.2d 845 (1966); *IAM v. TWA,* 839 F.2d 809

*erhood of Ry. & S.S. Clerks*, 181 F.2d 944, 946 (4th Cir.), *cert. denied*, 340 U.S. 851, 71 S.Ct. 78, 95 L.Ed. 623 (1950), the Fourth Circuit stated emphatically that

> there can be no doubt that the effect of [the RLA] was to vest in the Mediation Board exclusive jurisdiction over the certification of bargaining agents, the determination of bargaining units and the classification of employees for the purposes of bargaining. And it is equally clear that the exercise of discretion by the Board with respect to such matters is not subject to review by the courts.[14]

It is, therefore, settled beyond dispute that there is no judicial review of NMB's discretionary decisions. Federal court review is narrowly limited to allegations that the NMB has acted in violation of the Constitution, in excess of its jurisdiction,[15] or in gross violation of a "specific prohibition" in the RLA. *Railway Clerks*, 380 U.S. at 659–61, 85 S.Ct. at 1197–98 [quoting *Leedom v. Kyne*, 358 U.S. 184, 188, 79 S.Ct. 180, 183–84, 3 L.Ed.2d 210 (1958) ]; *see also IAM v. TWA*, 839 F.2d 809, 811 (D.C.Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 62, 102 L.Ed.2d 40 (1988); *British Airways Bd. v. National Mediation Bd.*, 685 F.2d 52, 56 (2d Cir.1982); *IBT v. Brotherhood of Ry., Airline & S.S. Clerks*, 402 F.2d 196, 205 (D.C.Cir.), *cert. denied*, 393 U.S. 848, 89 S.Ct. 135, 21 L.Ed.2d 119 (1968) "*IBT v. BRAC*"; *Air Canada v. NMB*, 478 F.Supp. 615, 616 (S.D.N.Y.1960). So limited is the scope of review, that the D.C. Circuit was moved to label it "one of the

narrowest known to the law." *IAM v. TWA*, 839 F.2d at 811. The question presented, then, is whether USAir's contentions in this case fit within this narrowly limited scope of review. They do not. USAir's contentions do not show that the NMB acted unconstitutionally, in excess of its authority or in gross violation of any specific RLA prohibition. Rather, as the following discussion reflects, all of the challenged NMB actions fall squarely within the ambit of the unreviewable discretion the RLA confers on the NMB.

■ USAir's principal complaint is the NMB's decision not to count the votes of 197 employees who switched to fleet service jobs after the cut-off dates established by the NMB. The exclusion of these votes, in USAir's view, unfairly disenfranchised a substantial block of employees for no good or sufficient reason. USAir emphasized to the NMB that the 197 workers had sought transfer to fleet service slots prior to the craft or class reconfiguration. This fact, USAir contends, shows that these employees were not shifted by USAir simply to pack the class. Accordingly, USAir contends that the NMB's refusal to adjust the cut-off dates to accommodate the 197 new fleet service employees constitutes a violation of the employees right to choose their bargaining representative contained in Section 2, Fourth of the RLA.

USAir's argument, while not without equitable appeal, is ultimately unpersuasive.

---

(D.C.Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 62, 102 L.Ed.2d 40 (1988); *In re Continental Airlines*, 50 B.R. 342 (S.D.Tex.1985); *Lamoille Valley R.R. v. National Mediation Bd.*, 539 F.Supp. 237 (D.Vt.1982); *British Airways Bd. v. National Mediation Bd.*, 533 F.Supp. 150 (E.D.N.Y.1982); *Philippine Airlines v. National Mediation Bd.*, 430 F.Supp. 426 (N.D.Cal.1977); *IAM v. National Mediation Bd.*, 409 F.Supp. 113 (D.D.C. 1976); *Aircraft Mechanics Fraternal Ass'n v. United Airlines*, 406 F.Supp. 492, 498 & n. 3 (N.D.Cal.1976). *IBT v. Brotherhood of Ry., Airline and Steamship Clerks*, 402 F.2d 196 (D.C. Cir.), *cert. denied*, 393 U.S. 848, 89 S.Ct. 135, 21 L.Ed.2d 119 (1968); *WES Chapter Flight Engineers' Int'l Ass'n v. National Mediation Bd.*, 314 F.2d 234 (D.C.Cir.1962); *UNA Chapter, Flight Engineers' It'l Ass'n v. National Mediation Bd.*, 294 F.2d 905 (D.C.Cir.1961), *cert. denied*, 368 U.S. 956, 82 S.Ct. 394, 7 L.Ed.2d 388 (1962);

*Decker v. Linea Aeropostal Venezolana*, 258 F.2d 153 (D.C.Cir.1958); *United Transport Serv. Employees v. National Mediation Bd.*, 179 F.2d 446 (D.C.Cir.1949).

**14.** For additional Fourth Circuit decisions embodying this principle, see *Brotherhood of Ry. & Steamship Clerks v. Atlantic Coast Line Ry.*, 201 F.2d 36, 38–39 (4th Cir.), *cert. denied*, 345 U.S. 992, 73 S.Ct. 1131, 97 L.Ed. 1400 (1953); *Division of No. 14, Order of R.R. Tel. v. Leighty*, 298 F.2d 17, 19 (4th Cir.), *cert. denied*, 369 U.S. 885, 82 S.Ct. 1160, 8 L.Ed.2d 287 (1962).

**15.** *See International Longshoremen's Ass'n v. North Carolina Ports Auth.*, 463 F.2d 1 (4th Cir. 1972) (courts have jurisdiction to determine whether an employer qualifies as a "carrier," but not to review merits of NMB representation decision).

In a perfect world, a perfect election might well have included the 197 new fleet service personnel. But this is not a perfect world and, more importantly, this Court does not sit to ensure that the NMB conducts perfect elections. To read Section 2, Fourth in the manner invited by USAir would effectively confer on federal courts a supervisory role in representation elections never intended by Congress. On the contrary, the RLA commits voter eligibility determinations to the unreviewable discretion of the NMB. Section 2, Ninth makes unmistakably clear that "[i]n the conduct of any election for the purposes herein indicated, the board shall designate who may participate in the election and establish rules to govern the election...." 45 U.S.C. § 152, Ninth. Thus, NMB's selection of cut-off dates is an unreviewable exercise of its discretion to determine voter eligibility.[16] And so it must be if the RLA is to achieve its purpose of "prompt and orderly settlement" of labor management disputes in order to avoid disruptions in carrier operations. *See* 45 U.S.C. § 151a; *see also IBT v. Bhd. of Ry., Airline & S.S. Clerks*, 402 F.2d 196 (D.C.Cir.), *cert. denied*, 393 U.S. 848, 89 S.Ct. 135, 21 L.Ed.2d 119 (1968) (RLA's primary purpose is expeditious resolution of representation disputes); *Railway Clerks*, 380 U.S. at 667–68, 85 S.Ct. at 1201–02. Any other result would contravene Congress' intent that "[t]here was to be no dragging out of the controversy [representation disputes] into other tribunals of the law." *Switchmen's*, 320 U.S. at 305, 64 S.Ct. at 99.

Courts have uniformly rejected challenges to NMB voter eligibility determinations. The Fourth Circuit's statement in *Rose* is typical. Citing *Switchmen's*, Chief Judge Parker wrote

the NMB has exclusive jurisdiction over *the certification of bargaining agents, the determination of bargaining units, and the class of employees for the purpose of bargaining.* And it is equally clear that the exercise of discretion by the Board with respect to such matters is not subject to review by the courts.

*Rose*, 181 F.2d at 946 (emphasis added). Nor is there any doubt that this unreviewable discretion extends to setting cut-off dates. For example, in *British Airways Bd.*, the carrier unsuccessfully challenged cut-off dates set two and one-half years prior to the election. Less than a fourth of this time elapsed between the cut-off dates and the election in the case at bar. Yet, even given a two and one-half year delay, the *British Airways Bd.* court found no "gross violation of the statute [RLA] or any error of constitutional dimension." 533 F.Supp. at 157. In granting summary judgment, the court there went on to say that "[t]here is no clear statutory provision indicating that the NMB may not under some circumstance impose a cut-off date which happens to be [more than] a year prior to the actual conduct of the election." *Id.* at 156 (quoting *Air Canada v. National Mediation Bd.*, 478 F.Supp. 615, 617 (S.D.N.Y.1979)).

So narrow is the scope of review on eligibility determinations that attacks are often cloaked in the language of NMB failures to fulfill the RLA duty to investigate.[17] Even so, courts have uniformly rejected such challenges. *See, e.g., IAM v. TWA*, 654 F.Supp. 447 (D.D.C.1987), *aff'd*, 839 F.2d 809 (D.C.Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 62, 102 L.Ed.2d 40 (1988); *Sedalia–Marshall–Boonville Stage Line v. National Mediation Bd.*, 574 F.2d 394, 395–96 (8th Cir.), *cert. denied*, 439

---

**16.** Eligibility cut-off dates, by their nature, cannot escape some degree of arbitrariness. Each situation presents different considerations. A balance must be struck between an early cut-off date to protect the integrity of the vote and a later date that permits more employees to participate. *See British Airways Bd. v. National Mediation Bd.*, 533 F.Supp.150 (E.D.N.Y.), *aff'd*, 685 F.2d 52 (2d Cir.1982). The striking of this balance is committed to the exclusive discretion of the NMB.

**17.** This is not surprising given that in the 24 years since *Railway Clerks*, the only RLA "specific prohibition" courts have agreed to review is a complete or gross failure by the NMB to investigate. *See Russell v. National Mediation Bd.*, 714 F.2d 1332 (5th Cir.1983), *cert. denied*, 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984); *International In–Flight Catering Co. v. National Mediation Bd.*, 555 F.2d 712 (9th Cir. 1977).

U.S. 881, 99 S.Ct. 218, 58 L.Ed.2d 193 (1978); *Air Line Employees Ass'n Int'l v. National Mediation Bd.*, 107 L.R.R.M. (BNA) 2428 (D.D.C.1981). The same result is warranted here. The record reflects that USAir submitted briefs setting forth its argument that the cut-off dates unfairly disenfranchised 197 employees. The record also reflects that the NMB received and considered these submissions. As *Railway Clerks* directs, the RLA requires no more by way of investigation. 380 U.S. at 666, 85 S.Ct. at 1200–01. Finally, USAir argues that the certification should be overturned because the NMB "offered no rational justification" for excluding the 197 employees. The short answer is that the NMB is not required to do so. *See British Airways Bd.*, 533 F.Supp. at 155 ("The NMB is not, as a statutory matter, required to explain how the evidence adduced during the course of an investigation supports its determination"). In sum, USAir's attack on the NMB's cut-off dates cannot succeed in this Court; it falls outside the permissible scope of judicial review. The RLA commits eligibility determinations, including the setting of cut-off dates, exclusively to the NMB. It is simply not open to this Court to second-guess the NMB and direct the adoption of some optimal cut-off dates to ensure some optimal degree of employee participation in the election.

■ Next, USAir argues that judicial review and reversal of the NMB's certification is required because the NMB's investigation of electioneering misconduct and administrative error was so deficient as to constitute a gross violation of its RLA duty to investigate. Specifically, USAir contends that the NMB failed adequately to investigate USAir's allegations of unlawful ballot collection, vote fraud and administrative errors in the use and distribution of ballots. The defect in USAir's argument is that it does not (and cannot) rest on a complete refusal or failure by NMB to conduct any investigation at all. Rather, it contests the adequacy of an NMB investigation that undeniably occurred. Given this, controlling decisions establish that judicial review is impermissible.

Analysis of the "failure to investigate" claim properly begins with *Switchmen's* and *Railway Clerks.* Both decisions make clear that the RLA nowhere mandates that the NMB investigate specific facts or allegations or that it issue any findings of fact and conclusions of law. *See Switchmen's*, 320 U.S. at 304, 64 S.Ct. at 98–99. The NMB's duty to investigate is met when it does no more than "receive[ ] and consider[ ] statements from the carrier and the [union]," schedule an election, "accept[ ] and study[ ]" a carrier's objections and reach a representation determination. *Railway Clerks*, 380 U.S. at 666, 85 S.Ct. at 1200–01. The record here reflects the NMB did just this. USAir incorrectly claims that the NMB was required to obtain and compare handwriting exemplars to rule out ballot fraud. Not so; the duty to investigate is unspecific and implies broad discretion. "Congress has simply told the Board to investigate and has left to it the task of selecting the methods and procedures which it should employ in each case." *Railway Clerks*, 380 U.S. at 662, 85 S.Ct. at 1198–99. Thus, decisions uniformly recognize that the RLA requires no particular form of investigation and, indeed, commits the specific form of an investigation in each particular case to the broad discretion of NMB.[18] "[A]ll details and procedures con-

---

18. *See e.g. Sedalia–Marshall–Boonville*, 574 F.2d at 397; *Ruby v. American Airlines*, 323 F.2d 248 (2d Cir.1963), *cert. denied*, 376 U.S. 913, 84 S.Ct. 658, 11 L.Ed.2d 611 (1964); *WES Chapter Flight Engineers' Int'l Ass'n v. National Mediation Board*, 314 F.2d 234 (D.C.Cir.1962); *Aeronautical Radio v. National Mediation Bd.*, 380 F.2d 624, 626 (D.C.Cir.), *cert. denied*, 389 U.S. 912, 88 S.Ct. 237, 19 L.Ed.2d 259 (1967); *IAM v. Alitalia Airlines*, 600 F.Supp. 268, 275 (S.D.N.Y.1984) (RLA does not *require* any particular form of investigation; that determination is committed to the Board's discretion) (citing *Railway Clerks*), *aff'd*, 753 F.2d 3 (2d Cir.1985); *IAM v. TWA*, 654 F.Supp. 447, 450–51 (D.D.C.1987), *aff'd*, 839 F.2d 809 (D.C.Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 62, 102 L.Ed.2d 40 (1988); *British Airways Bd. v. National Mediation Bd.*, 533 F.Supp. 150 (E.D.N.Y.), *aff'd*, 685 F.2d 52 (2d Cir.1982) (after a "limited investigation" of a charge that void and valid ballots had been intermingled, the Board counted all ballots, and the court refused to review this decision); *see also Teamsters v. National Mediation Bd.*, 107 L.R.R.M. 3038, 3039 (D.D.C.1981) (no violation

cerning the duty to investigate [are left] to the Board's discretion." *In re Continental Airlines*, 50 B.R. 342, 372, (S.D.Tex. 1985) (citations omitted). Judicial review is not warranted merely because USAir makes a persuasive showing that the investigation should have been more thorough or that some impropriety may have tainted the vote. *Id.* Simply put, courts "lack the authority to inquire further into the kind, quality, or results of such an investigation." *Lamoille Valley R.R. v. National Mediation Bd.*, 539 F.Supp. 237, 244 (D.Vt. 1982) (citations omitted). Courts are not empowered to review the procedure, adequacy or outcome of NMB investigations.[19] Were this not the law, the result would be frustration of the RLA's primary goal of expedition in the resolution of representation disputes.[20]

*Ruby v. American Airlines*, 323 F.2d 248 (2d Cir.1963), *cert. denied*, 376 U.S. 913, 84 S.Ct. 658, 11 L.Ed.2d 611 (1964) is instructive. There, the Second Circuit found that the NMB had fulfilled its duty to investigate where no testimony was taken and the NMB issued a decision on the basis of pleadings, exhibits and its own knowledge. Importantly that court recognized that the challenge there, as here, was not an attack on whether *any* investigation had occurred, but on the *adequacy* of the investigation and the conclusions reached. *Id.* at 253–56. Neither the *Ruby* court nor this Court has jurisdiction to consider such an attack. Even a "peek" at the record discloses no constitutional or statutory violations. As the RLA requires, the NMB investigated the overall representation dispute, reviewed, considered and rejected

USAir's objections, held an election and certified a representative. Because this Court is not empowered to review the adequacy of the NMB's investigation, it intimates no view on whether vote fraud, duplicate ballot misuse or other misconduct either occurred or were material to the outcome of the election. That task is committed to the NMB's unreviewable discretion.

■ USAir's final attack is aimed at the NMB's certification of the Teamsters as the union representative, given that the Teamsters won only a plurality, not a majority. The NMB arrived at this result by assuming that employees voting for some type of representation—here the IAM—preferred representation over nonrepresentation. By adding the small number of IAM votes to the votes cast for the Teamsters, the NMB found that a narrow majority favored representation. USAir contends this vote tallying procedure is illegitimate and asks this Court to find that it contradicts a specific RLA prohibition. It does not. Although not decided in the Fourth Circuit, at least two other Circuits have rejected identical claims. In *Zantop Int'l Airlines v. National Mediation Bd.*, 732 F.2d 517 (6th Cir.1984), the Sixth Circuit specifically approved the lumping together of votes for pilots' and flight engineers' unions as votes for representation. There, among Zantop's pilots, the UAW received 88 votes, three shy of a majority. Nonetheless a majority for representation was found because four pilots had voted for another representative. The same occurred with the flight engineer vote. A

---

of duty to investigate where Board misplaced 57 ballots for Teamsters and applied the standard certification bar on discovery of error); *United Transp. Serv. Employers v. National Mediation Bd.*, 141 F.2d 724 (D.C.Cir.1944) (following *Switchmen's*, the court refused to review adequacy of NMB investigation and decision where union alleged that illegal ballots had been accepted by the Board and that opposing union had engaged in brutality and coercion with the approval of the carrier).

**19.** Thus, more than one court has refused review of investigations even where it appeared that decisions were made in a matter of hours or after a cursory review. *See Air Line Employ-*

ees *Ass'n Int'l v. National Mediation Bd.*, 107 L.R.R.M. (BNA) 2428 (D.D.C.1981); *In re Continental Airlines*, 50 B.R. 342 (S.D.Tex.1985); *Long Island R.R. Co. v. National Mediation Bd.*, 703 F.2d 680 (2d Cir.1983).

**20.** Cases are legion recognizing expedition as a primary RLA purpose. *See, e.g., IBT v. BRAC*, 402 F.2d 196 (D.C.Cir.), *cert. denied*, 393 U.S. 848, 89 S.Ct. 135, 21 L.Ed.2d 119 (1968); *In re Continental Airlines*, 50 B.R. at 362, 119 L.R.R.M. at 2765 ("strong RLA policy of expeditiously and dispositively resolving representation disputes").

majority favoring representation was found by aggregating votes for all unions and certification was then granted to the union winning a majority of the votes cast for representation. This was held to be consistent with the RLA's majority rule requirement. 732 F.2d at 522. The D.C. Circuit reached the same result in *Aeronautical Radio v. National Mediation Bd.*, 380 F.2d 624, *cert. denied*, 389 U.S. 912, 88 S.Ct. 237, 19 L.Ed.2d 259 (1967) (the union receiving a majority of the 52% voting for representation was certified even though it received only 30% of all the votes cast). This Court agrees with the reasoning and results of these opinions. They are consistent with the Supreme Court's instructions that "the Board alone [is] to establish the rules governing elections" and "the details of selecting representatives were to be left for the final determination of the Board." *Railway Clerks*, 380 U.S. at 668–69, 85 S.Ct. at 1201–02. Here again, therefore, USAir's contention fails; the NMB's rules concerning elections are unreviewable by federal courts.

## B. *The Counterclaim*

The Teamsters' counterclaim is the obverse of the complaint. The latter seeks to overturn the certification and the former to enforce it. From this, it would seem to follow that if the complaint fails, as happens here, then the counterclaim should succeed. That, however, is not the case.

The counterclaim seeks enforcement of the certification in three specific ways that, as the following discussion discloses, are not warranted here.

■ First, the Teamsters' counterclaim seeks an order compelling USAir "to treat with," or bargain with, the union. Ordinarily, this would be the logical consequence of losing a certification challenge. *See Bhd. of Ry. & S.S. Clerks v. Ass'n for the Benefit of Non–Contract Employees*, 380 U.S. 650, 658, 85 S.Ct. 1192, 1196–97, 14 L.Ed.2d 133 (1965). Indeed, federal courts have "very, very limited equitable power to refuse enforcement" of a valid certification. *United States v. Feaster*, 410 F.2d 1354, 1363 (5th Cir.), *cert. denied*, 396 U.S. 962, 90 S.Ct. 427, 24 L.Ed.2d 426 (1969). In this instance, however, USAir has formally represented to the Court that it will bargain with the Teamsters as the certified representative of a USAir systemwide craft or class of fleet service employees.[21] A schedule for this bargaining has already been established.[22] USAir's previous refusal to bargain was based on its good faith, but erroneous view that the allegations in the complaint were sufficient to overturn the certification.[23] Once this Court ruled to the contrary, USAir agreed to bargain with the Teamsters. Given these facts, the Court concludes there is no sufficient reason to issue an order enforcing bargaining. Judicial intervention

**21.** Specifically, USAir represented as follows:

(1) Pursuant to the Section 2 First of the Railway Labor Act, 45 U.S.C. § 152 First, and National Mediation Board certification R–5823, 16 NMB No. 31 (1988), USAir will continue to bargain in good faith with the International Brotherhood of Teamsters as the representative of a systemwide unit of approximately 4,000 fleet service employees on USAir,

(a) subject to any reversal by the Court of Appeals of this Court's dismissal of USAir's action to vacate the certification, and,

(b) contingent upon the National Mediation Board's resolution of USAir's February 2, 1989 request to terminate the certification upon the effective date of an operational merger between USAir and Piedmont Aviation and any judicial review thereof.

There are no other qualifications upon USAir's commitment to bargain.

(2) Consistent with this representation, USAir has by letter of April 7, 1989 proposed to the

National Mediation Board a schedule of Section 6 proposals, direct negotiations, and mediation directed towards a systemwide collective bargaining agreement.

**22.** Under the current schedule, USAir will submit its Section 7 proposals on May 1, 1989 and direct negotiation meetings will be held during the period May 9 to June 4. The proposed schedule also provides for the assistance of NMB mediation beginning June 5, 1989 if agreement is not reached by this date.

**23.** Not presented here is whether the RLA requires carriers to proceed to treat or bargain with a certified representative during the pendency of a certification challenge. *Cf. American Federation of Labor v. NLRB*, 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347 (1940) (under NLRA, employer contesting certification must refuse to bargain and assert its position as a defense to an unfair labor practice charge).

should be the exception, not the rule, under the RLA scheme. As the Supreme Court has stated, "[e]ven when a violation of a specific mandate of the RLA is shown, 'courts should hesitate to fix upon the injunctive remedy ... unless that remedy alone can effectively guard the plaintiff's right.'" *Burlington Northern R.R. v. Bhd. of Maintenance Way Employees*, 481 U.S. 429, 446, 107 S.Ct. 1841, 1852, 95 L.Ed. 2d 381 (1987). Injunctive relief is simply out of place here, for its purpose is to coerce a party to do that which it is unwilling to do or cannot be relied upon to do. Neither is the case here. There is no apparent reason to doubt that USAir is sincere and serious in its representation and that it will fully comply with its duty to bargain in good faith under the RLA. Should this not prove to be the case, the Teamsters may certainly return to this Court for appropriate relief. For now, however, this aspect of the Teamsters motion for summary judgment on the counterclaim is denied as moot.

■ Next, the Teamsters seek names and other job-related information pertaining to USAir's fleet service employees. In support of this claim, the Teamsters rely chiefly on NLRA decisions compelling production of such data if necessary and reasonable to the union's bargaining duty.[24] Although USAir initially resisted furnishing the bulk of this information, by the time of the hearing on the counterclaim (April 7, 1989), USAir had voluntarily furnished to the Teamsters the employees' names, wage level and seniority. Only the addresses were withheld. USAir declined on privacy grounds to divulge this information. By the time of the hearing, therefore, only addresses remained at issue. In the course of the hearing, the Court directed the parties to confer on the matter with an eye toward devising a procedure that would strike an appropriate balance between employees' privacy interests and the interest in ensuring that the union is able to function effectively as the employees' bargaining representative. The parties met and, while they did not reach agreement, USAir's final proposal narrows the issue before the Court. In essence, USAir has proposed that it send a letter to the home of each fleet service employee inquiring whether that employee wishes to authorize release of private home addresses to the Teamsters. If so, the employee is to return a card to a neutral person. This person, equipped with a complete address list, would then give the Teamsters the addresses of those employees who returned cards authorizing release of their addresses.[25] Given this, the narrow, more sharply focused question before the Court is whether the RLA mandates production of all addresses in these circumstances. The Court concludes it does not.

Notably, in the more than one half century of the RLA's existence, no court has ever compelled a carrier to disclose employees' private home addresses. This reflects the RLA's scheme of substantially unregulated bargaining with very limited scope for judicial intervention. After the bargaining process has run its course, courts may review whether a party has violated any bargaining obligations under Section 2, First, 45 U.S.C. § 152 First. *See Chicago & North Western Ry. v. United States*, 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1979) (bare majority found narrow, sharply limited role for courts in the RLA bargaining process while dissenting four justices, per Brennan, J., excluded any judicial supervisory role). The Supreme Court recently reiterated this non-intervention principle in reversing the Ninth Circuit's intervention on post-strike seniority issues. It noted that the RLA "provides an exhaustively detailed procedural framework to facilitate the voluntary settlement of major

---

**24.** *See, e.g., NLRB v. Acme Industrial Co.*, 385 U.S. 432, 437, 87 S.Ct. 565, 568, 17 L.Ed.2d 495 (1967).

**25.** The only objection the Teamsters had to this aspect of the proposal was that it is structured as an "opt in" rather than an "opt out" procedure. The Teamsters argued that the union, as the certified representative, should have all addresses except those of employees who return cards directing that their addresses not be divulged. The Court does not consider that there is any substantial practical difference between the "opt in" and "opt out" procedures.

disputes" and the "effectiveness of these private dispute resolution procedures" depends, in part, on the "assurance that neither party will enlist the courts to further its own partisan ends." *Trans World Airlines v. Indep. Fed'n of Flight Attendants,* —— U.S. ——, ——, 109 S.Ct. 1225, 1233–1234, 103 L.Ed.2d 456 (1989). In sum, it seems clear that the RLA has not been construed to confer on federal courts an "unfair labor practice" jurisdiction analogous to that given to the NLRB. *Chicago & North Western Ry.,* 402 U.S. at 579 n. 11, 91 S.Ct. at 1736 n. 11 (parallels between NLRA and RLA should be drawn "with the utmost care and with full awareness of the differences" between the NLRA and RLA schemes). It follows, therefore, that courts should generally decline invitations to oversee or police the RLA bargaining process.

Following this sound general principle, the Ninth Circuit ruled that the RLA did not authorize courts to compel prearbitration discovery of financial information relevant to the carrier's contention that layoffs were necessary. *Pacific Fruit Express v. Union Pacific,* 826 F.2d 920 (9th Cir.1987). A more recent district court opinion criticizes *Pacific Fruit* and reaches a contrary conclusion. *See Indep. Fed'n of Flight Attendants v. Trans World Airlines,* 682 F.Supp. 1003 (W.D.Mo.1988) (*"IFFA "*). In *IFFA,* the district court considered that judicial intervention might well have been justified to require production of economic information about other groups in the workforce (the pilots). That court viewed such discovery intervention as minimally

intrusive. Perhaps so, but this Court views with substantial skepticism the notion that a judicial discovery role under Section 2, First would be minimally intrusive. The opposite seems more likely. The preferable course is to let the parties bargain about the disclosure of this information as they bargain about other aspects of the employer-employee relationship.

In any event, this Court need not ultimately choose between *Pacific Fruit* and *IFFA* because the facts of those cases are different from those at bar. Moreover, this Court is not called upon to declare that there is never any discovery role whatever for courts to play in the RLA bargaining process, or that there are no circumstances in which a court would be justified in compelling production of information relevant to bargaining issues. Rather, all this Court must decide is whether it should order wholesale, indiscriminate production of employees' addresses where the carrier has proposed a reasonable means for providing the union with the addresses of those employees who wish their addresses disclosed. No persuasive justification has been suggested for compelling a carrier to divulge the names of employees who do not wish their addresses disclosed. Employees' privacy interests are not decisive, but deserve some recognition.[26] More important is the RLA's strong preference for judicial non-intervention, and the Parties' sensible negotiated resolution. Accordingly, the Court concludes that, even assuming, *arguendo,* that the Teamsters need the addresses for effective bargaining,[27] no or-

---

**26.** To be sure, home addresses are not always closely-guarded secrets. Except for those who choose unlisted numbers, many others must except that their addresses may be found in the telephone directory. This fact diminishes but does not eliminate the employees' privacy interests and expectations. The Fourth Circuit recognizes this by declining to require the disclosure of addresses to unions under the Freedom of Information Act. *See American Fed'n Gov't Employees, Local 1923 v. U.S. Dept. of Health & Human Services,* 712 F.2d 931 (4th Cir.1983).

**27.** Unions have traditionally communicated with employees in a number of relatively nonintrusive means. Typically, union representatives have been posted at the employer's gate to

distribute hand bills on union matters. The Teamsters have apparently done so at USAir's exit gates. The Teamsters also use a toll-free hotline and its number is or can be made well-known. (1–800–HEAR–IBT). The hotline and information bills handed out at exit gates can be used to announce meetings held at some appropriate time and place off the employer's premises or to request addresses. Of course, the Teamsters may also resort to the telephone directory.

One need not be a cynic to suspect that the dispute over addresses may have less to do with ensuring effective union bargaining than with the parties' focus on the upcoming USAir–Piedmont merger. The Teamsters may want the addresses to help consolidate the union's position prior to the merger, while USAir, by oppos-

der should issue compelling production of all addresses. The parties are left with their negotiated solution on this issue.

█ Third, the Teamsters' request access to USAir's facilities to meet and confer with employees. Again, in more than one half a century of RLA history, no court has ordered this relief. By no means is it "minimally intrusive" for courts to order union access to an employer's facilities. *See Chicago & Northwestern Ry.*, 402 U.S. at 579, 91 S.Ct. at 1736. Nor is there any compelling reason to order such access in this case. The union has other adequate and less intrusive means of communicating with employees and meetings can easily be held at locations other than the workplace. *See supra* note 27. The Teamsters cite no RLA or NLRA decisions which, under the circumstances at bar, require access to employer facilities.[28] The Court concludes that such intrusive relief is not called for here. As with employee addresses, the issue of facilities access should be resolved through collective bargaining.

An appropriate order will enter.

ing disclosure, may seek to prevent this. Whether or not these are the parties' actual motives, they are irrelevant to the Court's analysis.

28. The Teamsters cite several NLRA cases in which facility access was allowed. *Winona Industries,* 257 N.L.R.B. 695 (1981); *Holyoke Water Power Co.,* 273 N.L.R.B. 1369, *enf'd sub nom., NLRB v. Holyoke Water Power Co.,* 778 F.2d 49 (1st Cir.1985), *cert. denied,* 477 U.S. 905, 106 S.Ct. 3274, 91 L.Ed.2d 565 (1986). These cases are inapposite—in both, union access was needed to check safety requirements or working conditions. Under the NLRA, access to employer's facilities is strictly regulated. Under the *Winona* standard, a union must demonstrate that information to be discovered through inspection of the facilities is relevant to the union's duty to represent its members. If the company objects, the union is required to attempt to reach an accommodation. Under the NLRB's *Holyoke Water Power* decision, the employees' right to be responsibly represented by the union is balanced against the right of the employer to control its property and ensure that its operations are not disrupted. Where the union can effectively represent employees without entering the employer's premises, access will be denied. In sum, even under the NLRA the Teamsters access to USAir's facilities would not be assured.